IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HEATHER BOWEN,<br><br>     Plaintiff,<br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration[1]<br>     Defendant. | MEMORANDUM DECISION AND ORDER AFFIRMING THE DECISION OF COMMISSIONER<br><br>Case No. 2:13-cv-00121-BCW<br><br>Magistrate Judge Brooke Wells |

All parties have consented to having United States Magistrate Judge Brooke C. Wells conduct all proceedings in this case, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit.[2]

Plaintiff Heather Bowen ("Plaintiff") seeks judicial review of the determination of the Social Security Administration that denied her applications for Supplemental Security Income, and Title II disability insurance benefits. After careful consideration of the written briefs and the administrative record, the Court has determined that oral argument is unnecessary and issues the following Memorandum Decision and Order AFFIRMING the decision of the Commissioner.

---

[1] On February 14, 2013, Carolyn W. Colvin ("Commissioner") became the Acting Commissioner of the Social Security Administration. Accordingly, she has been automatically substituted for Michael J. Astrue as the defendant in this action. See 42 U.S.C. § 405(g)("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of the Commissioner of Social Security or any vacancy in such office."); F.R.C.P. 25(d)("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise); docket no. 7.
[2] See 28 U.S.C. § 636(c); F.R.C.P. 73; docket no.15.

# BACKGROUND[3]

Plaintiff was born on August 31, 1967.[4] On November 28, 2008 while living in the state of Washington, Plaintiff was involved in a car accident and suffered injury to her back. Plaintiff claims since this accident, she has pain in her back that prevents her from working. On February 16, 2011, after moving to Utah and pursuing treatment for her back and leg pain issues, Plaintiff sustained injuries in another car accident which according to her treating physician, worsened her existing back condition. In 2010, after demonstrating tenderness in the areas required, Plaintiff was diagnosed with post-accident fibromyalgia.[5]

A. **Procedural History**

On August 17, 2009, Plaintiff filed a Title II application for a period of disability and disability insurance benefits.[6] Also, on August 17, 2009, Plaintiff protectively filed an application for supplemental security income.[7] In her applications for benefits, Plaintiff alleged an onset date of disability of November 29, 2008.[8] Plaintiff meets the insured status requirements through June 30, 2010.[9]

Plaintiff's claims were initially denied on November 20, 2009, and upon reconsideration on December 29, 2009.[10] On February 2, 2010, Plaintiff requested an administrative hearing.[11] A hearing before an Administrative Law Judge ("ALJ") was held on September 16, 2011 in St. George, Utah.[12] On October 3, 2011, the ALJ issued a written decision denying Plaintiff's

---

[3] The Court finds that the parties have adequately described Plaintiff's medical history in their briefs. Therefore, the Court will only briefly describe Plaintiff's history in order to provide context for the issues presented herein.
[4] Administrative Record, docket no. 10 [hereinafter referred to as "Tr."] at 38.
[5] Tr. at 524.
[6] Tr. at 21.
[7] Id.
[8] Id.
[9] Id.
[10] Tr. at 21.
[11] Id.
[12] Tr. at 37.

claims for benefits.[13] Plaintiff then appealed the ALJ's denial to the Social Security Appeals Council which denied a review of the ALJ's decision on January 18, 2013.[14] Pursuant to 42 U.S.C. § 405(g), this appeal followed.

### B. Hearing Testimony-September 16, 2011

At the hearing before the ALJ on September 16, 2011, testimony was received from Plaintiff and a vocational expert, Mr. Kenneth Lister.[15]

Counsel for Plaintiff testified at the time of Plaintiff's alleged onset date of disability, "she was diagnosed with disc disease in the thoracic spine. She was diagnosed with lumbar spine disorders which included bulging discs…"[16] At the time of the hearing, Plaintiff's counsel testified Plaintiff had been treated for her lower back and thoracic spine conditions with "all the normal modalities that they would normally treat those things for and they didn't resolve so she was later diagnosed with what her doctor calls post accident fibromyalgia…"[17] Plaintiff's counsel also stated that a study was performed on Plaintiff's cervical spine and that demonstrated she had "some sort of cervical spine degeneration."[18] Plaintiff's counsel stated, Plaintiff did not have any mental impairments.[19]

Plaintiff testified she has "severe back pain 80 percent of the time which causes other things to flare up where I will get nausea or headaches, stiffness and other times I have aching in my joints and arms and I have from my lower back down numbness into my legs…mainly achy."[20] Plaintiff then testified that her lower back is the most problematic but she also

---

[13] Tr. 21-32.
[14] Tr. at 1.
[15] Tr. at 36.
[16] Tr. at 39.
[17] Id.
[18] Id.
[19] Id.
[20] Tr. at 43.

experiences pain also in her thoracic and cervical spine.[21]  Plaintiff testified the pain she experiences keeps her from having a job and she hopes one day to find a cure to her condition so she can return to the workforce.[22]  However, Plaintiff testified her pain medications do help "a lot."[23] Plaintiff then testified that her doctor does not believe she will return to work because "[t]here's nothing major enough in [her] low back to cause the amount of pain [she's] in but from the accident that caused the disc bulge caused fibromyalgia to flare up and that makes everything more intense and there's not a way to fix that."[24] Plaintiff testified that she goes to the gym in order to try and get her body to exercise but it doesn't help with her condition.[25]  She also tried going to cosmetology school but had to quit after six weeks because it was too physically demanding for her.[26]

On a daily basis, Plaintiff testified she spends most of her time reading either sitting or laying down.[27]  Plaintiff is able to drive a car once a week to the doctor or the grocery store.[28] Plaintiff needs help around the house doing chores but she tries to do dishes and cook.  She only spends about a half hour a day doing these activities.[29]  Plaintiff testified she takes a five hour nap everyday and 80 percent of her days are "bad days" meaning, her pain interferes with her ability to do much more than "lay in bed or out on the couch and watch T.V."[30]  Plaintiff then testified "…since I first applied a lot has changed with my diagnosis and things continue to get worse."[31]

---

[21] Id.
[22] Tr. at 44.
[23] Tr. at 46.
[24] Tr. at 47.
[25] Id.
[26] Tr. at 47, 49.
[27] Tr. at 49.
[28] Id.
[29] Tr. at 50.
[30] Tr. at 50-51.
[31] Tr. at 53.

4

Testimony was then received from vocational expert, Kenneth Lister.[32] Mr. Lister testified Plaintiff's past jobs included cashier checker and customer service clerk.[33] The ALJ then asked the vocational expert a series of hypotheticals and Mr. Lister was cross-examined by Plaintiff's attorney.[34]

A. **ALJ's Decision**

The ALJ found at Step One of the required sequential evaluation process[35] that Plaintiff had not engaged in substantial gainful activity since November 29, 2008, the alleged onset date.[36] At Step Two, the ALJ found Plaintiff had the following severe impairments: (1) cervical, thoracic, and lumbar pain; (2) fibromyalgia; and (3) obesity.[37] With regard to these impairments, the ALJ stated "[t]he above impairments cause more than minimal limitation in the claimant's ability to perform basic work activities. The claimant's impairment cervical, thoracic, and lumbar pain have been acknowledged by the state agency as medically determinable."[38] At Step Three, the ALJ found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments contained within the regulations.[39] Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work…except

> Lift occasionally 20 pounds, frequently 10 pounds,
> Sit for 6 of 8 hours and stand 6 of 8 hours,
> Climb stairs occasionally, squat occasionally, kneel occasionally, walk occasionally,
> Frequently bend and stoop and reach above the shoulders,
> Push and pull frequently,

---

[32] Tr. at 54.
[33] Tr. at 58.
[34] Tr. 58-63.
[35] See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005)(explaining the five-step evaluation process for determining if a claimant is disabled).
[36] Tr. at 23.
[37] Id.
[38] Tr. at 23-24.
[39] Tr. at 24.

> Turn arms and wrists frequently, open and close fists frequently, use hands and fingers frequently,
> Use foot controls frequently,
> Balance one's self continuously,
> Drive a vehicle occasionally,
> Grip strength, fine dexterity, and manual dexterity, are normal range for both the right and left hands,
> Vision in left eye and right eye are normal,
> Hearing right ear and left ear are normal, no hearing aids,
> Ability to tolerate hot and cold setting are within normal range.
> No mental impairments have been alleged.

After making this finding, the ALJ discussed Plaintiff's medical treatment history, Plaintiff's credibility[40] and the opinions of Plaintiff's treatment providers Dr. Bradley Root, M.D., Dr. Max Root, M.D., and Mark Udy, PA-C.[41] The ALJ also discussed the opinions and findings of the state agency consultants.[42]

As to Dr. Bradley Root, the ALJ found Dr. Root

> ...does not offer specific limitations [through his letter dated January 6, 2010], and although the doctor does have a treating relationship with the claimant he consistently reports the claimant has a normal gait, sits and stands with no difficulties, and that medications are helping her as has been discussed throughout this decision. Therefore, the doctor's opinion is accordingly rendered less persuasive as to her back impairments. The undersigned does note Dr. Root feels the claimant has fibromyalgia. However, the doctor's opinion appears to rest at least in part on an assessment of an impairment outside the doctor's area of expertise. Therefore, his opinion is given some weight.[43]

Next, as to Dr. Max Root, Dr. Bradley's Root's colleague who examined the Plaintiff on April 6, 2010 for an impairment rating, the ALJ, after summarizing his findings and noting inconsistencies in the record, found his opinion to be "without substantial objective support for

---

[40] Tr. 25-30.
[41] Tr. at 30-31.
[42] Tr. at 31.
[43] Tr. at 30.

the other evidence in the record, which renders it less persuasive. Therefore, his opinion is given slight weight."[44]

As to Mark Udy, PA-C, who works along side Dr. Bradley Root, the ALJ noted that he was not considered an "acceptable medical source" under the regulations.[45] However, the ALJ noted that Mr. Udy has managed the claimant's care since May 18, 2009.[46] On July 21, 2011, Mr. Udy completed a "Physical Residual Function Capacity Statement" where he noted "restrictions consistent with a markedly reduced range of sedentary work. He opined she would be off task 30% or more due to physical limitations and miss five or more days a month."[47] The ALJ stated that Mr. Udy's opinion was entitled to "some consideration" because Mr. Udy was "part of Dr. Root's medical team and from medical progress notes was completed with the knowledge of Dr. Root."[48] But, the ALJ then found

> Mr. Udy apparently relied quite heavily on subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Doctor Root's exam on July 21, 2011...does not support this degree of limitation. The objective medical evidence does not demonstrate abnormalities that would interfere with the claimant's ability to perform the range of work identified above.[49]

Lastly, as to the state agency consultants, Dr. David O. Peterson, MD and Rox Burkett, M.D, who provided residual functional capacity evaluations at the initial and reconsideration levels, the ALJ found their conclusions support a finding of non-disabled.[50] Further, the ALJ found "[a]lthough those physicians were non-examining and therefore, their opinions are not

---

[44] Tr. at 31.
[45] Id.
[46] Id.
[47] Id.
[48] Id.
[49] Id.
[50] Id.

7

controlling...these opinions do deserve some weight, particularly in a case like this in which there exists a number of other reasons to reach similar conclusions..."[51]

The ALJ then found at Step Four, Plaintiff was "capable of performing past relevant work as a cashier checker and customer service clerk."[52] Based upon this finding, the ALJ did not need to proceed to Step Five of the sequential analysis. Accordingly, the ALJ found Plaintiff not to be disabled.

## **STANDARD OF REVIEW**

This Court's review of the ALJ's decision is limited to determining whether his findings are supported by "substantial evidence" and whether the correct legal standards were applied.[53] If supported by substantial evidence, the findings are conclusive and must be affirmed.[54] "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[55] Thus, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."[56] Moreover, a decision is not based on substantial evidence "if it is overwhelmed by other evidence in the record."[57]

Additionally, the ALJ is required to consider all of the evidence; however, the ALJ is not required to discuss all evidence.[58] In its review, the Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[59] However, a reviewing Court should not re-weigh the evidence or substitute its own judgment for

---

[51] Id.
[52] Id.
[53] Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); Ruthledge v. Apfel, 230 F.3d 1172, 1174 (10th Cir. 2000); Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1993).
[54] Richardson v. Perales, 402 U.S. 389, 401 (1981).
[55] Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).
[56] Zolanski v. FAA, 372 F.3d 1195, 1200 (10th Cir. 2000).
[57] Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009)(internal citation omitted).
[58] Id. at 1066.
[59] Shepherd v. Apfel, 184 F.3d 1196, 1199 (10th Cir. 1999).

that of the ALJ's.[60] Further, the Court "…may not 'displace the agenc[y]'s choice between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been before it de novo."[61] Lastly, "[t]he failure to apply the correct legal standard[s] or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed [are] grounds for reversal."[62]

In applying these standards, the Court has considered the Administrative Record, relevant legal authority, and the parties' briefs and arguments. The Court deems oral argument to be unnecessary, and finds as follows:

## ANALYSIS

Plaintiff raises two issues upon appeal: (1) whether the ALJ erred by failing to properly evaluate the medical opinion evidence in the record and (2) whether the ALJ erred by failing to include all established impairments in Ms. Bowen's residual functional capacity assessment.

### A. Treating and Examining Medical Providers

Plaintiff argues that the ALJ failed to properly evaluate the medical opinion evidence in the record. Specifically, Plaintiff argues that the ALJ erred in his evaluation of the opinions of Plaintiff's treating physician, Dr. Bradley Root and Plaintiff's treating physician's assistant, Mark Udy.

In the 10th Circuit, in evaluating medical opinions rendered in regard to Plaintiff's abilities "…the ALJ must complete a two-step inquiry, each step of which is analytically distinct."[63] "The initial determination the ALJ must make with respect to a treating physician's medical opinion is whether it is conclusive, i.e., is to be accorded controlling weight, on the

---

[60] Qualls v. Apfel, 206 F.3d 1368, 1371 (10th Cir. 2000).
[61] Lax, 489 F.3d at 1084 (quoting Zoltanski, 372 F.3d at 1200).
[62] Jensen v. Barnhart, 436 F.3d 1163, 1165 (10th Cir. 2005)(internal citations omitted).
[63] Krauser v. Astrue, 638 F.3d 1324, 1330 (10th Cir. 2011).

matter to which it relates."[64] "The ALJ must give 'controlling weight' to the treating physician's opinion, provided that opinion 'is well supported…and is not inconsistent with other substantial evidence…'"[65] "If the opinion is deficient in either of these respects, it is not to be given controlling weight." However, "[e]ven if a treating physician's opinion is not entitled to controlling weight, treating source medical opinions are still entitled to deference[.]" At the second step in the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors" provided in [20 C.F.R. § 404.1527].

Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. "If this procedure is not followed, a remand is required."

Plaintiff argues the ALJ erred in finding that the objective medical evidence in the record did not support the findings of Dr. Root and Mr. Udy. Plaintiff argues her fibromyalgia diagnoses by its very nature would not be expected to reflect the objective findings the ALJ seems to be looking for. Further, Plaintiff argues that Dr. Root by his collaboration with Mr. Udy did provide specific limitations contrary to the ALJ's assertion. Lastly, Plaintiff argues that the ALJ was in error when he stated that that Dr. Root's opinion should be discounted because the diagnosis of fibromyalgia was out of his area of expertise. Plaintiff argues "[t]here is no

---

[64] Id. (citing Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003).
[65] White v. Barnhart, 287 F.3d 903, 907 (10th Cir. 2000)(citing 20 C.F.R. § 404.1527(d)(2)).

10

evidence cited to support this and nothing in the record [that] would indicate that Dr. Root is not qualified to make a diagnosis of fibromyalgia."[66]

As to the ALJ's conclusion with regard to Mr. Udy, Plaintiff argues the ALJ erred because the ALJ did not provide any citations to the record that would support his finding that Mr. Udy relied on the Plaintiff's subjective complaints. Plaintiff argues that the ALJ's conclusion is pure speculation. "Nowhere in his opinion does Mr. Udy indicate these are limitations reported by Ms. Bowen. Rather they are the result of his long-term treatment and observation of Ms. Bowen."[67]

Defendant on the other hand, argues that review of the records reveals the ALJ's finding that Mr. Udy's July 21, 2011 opinion was unsupported by the contemporaneous examination performed by Dr. Root. Therefore, the ALJ correctly found this opinion not to be entitled to significant weight.

Upon examination, the Court finds that substantial evidence supports the ALJ's findings with regard to Dr. Root and Mr. Udy. Although the ALJ did not specifically state Dr. Root's opinion was not entitled to controlling weight, the Court finds the ALJ applied the proper framework.

As the second step of the 10th Circuit's analysis, it is true that the ALJ did not address each of the factors in evaluating Dr. Root's January 6, 2010 letter. However, the ALJ is not required to discuss each factor, as long as "the ALJ's decision [is] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."[68] The Court finds the ALJ made clear how much weight Dr. Root's opinion was entitled ("some weight") and correctly noted that this 2010

---

[66] Opening Br. at p. 12, docket no. 16.
[67] Id. at 13-14.
[68] Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007)(internal quotation marks omitted).

11

letter did not offer specific limitations.  In addition, the ALJ's evaluation of Dr. Root's opinion was sufficiently tied to the factors.  The ALJ noted Dr. Root had a treatment relationship with Plaintiff and provided a brief summary of the contradictions in Dr. Root's 2010 opinion and his own treatment records.  The ALJ noted that Dr. Root consistently reports "the claimant has a normal gait, sits and stands with no difficulties and that medication are helping her…"  However, Dr. Root's 2010 letter states "she has failed to respond to standard, traditional treatments.  This low back pain is constant in nature and is significantly affecting her activity level and quality of sleep."[69]  This analysis demonstrates consideration of factors one, three and four.

Moreover, upon further review of the ALJ's opinion, contrary to the Plaintiff's argument that Plaintiff's fibromyalgia wouldn't produce objective medical records because it is a subjective ailment, the ALJ's opinion indicates that the ALJ does not suggest that fibromyalgia needs more concrete documentation.  Rather, the ALJ's opinion states that Dr. Root's opinion is less persuasive due to lack of treatment records as to "*the Plaintiff's back impairments*."[70]

Furthermore, the ALJ's statement "...the doctor's opinion appears to rest at least in part on an assessment of an impairment outside of the doctor's area of expertise" clearly indicates that factor number 5 was considered and weighed by the ALJ.  Although the ALJ cites no authority in making this statement, the Court finds no error because the ALJ's discussion demonstrates that the analysis was tied to the factors and a reasonable mind could this as adequate to support the ALJ's conclusion.[71]

As to Mr. Udy's opinion, the ALJ correctly stated Mr. Udy was not an "acceptable medical source."  The regulations contemplate the use of information from "other sources," both

---

[69] Tr. at 460.
[70] Tr. at 30 (emphasis added).
[71] Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

medical and non-medical.[72]  "Other medical sources" include, but are not limited to, "nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists."[73] These sources may provide "insight into the severity of the [Plaintiff's] impairment(s) and how it affects the individual's ability to function."[74]  Thus, the ALJ must "explain the weight given to these opinions or otherwise ensure that the discussion of the evidence allows a claimant or subsequent reviewer 'to follow adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.'"[75]

Here, with regard to Mr. Udy, the ALJ noted that Mr. Udy had managed the claimant's care for at least two years before he filled out the "Physical Residual Function Capacity Statement" and opined that Plaintiff's restrictions were consistent with a markedly reduced range of sedentary work.[76]  The ALJ found this opinion to be entitled to some consideration because Mr. Udy was a part of Dr. Root's treatment team and his medical progress notes were completed with the knowledge of Dr. Root.  However, the ALJ found Mr. Udy "seemed to uncritically accept as true most, if not all, of what the claimant reported."  As support for this finding, the ALJ cited Dr. Root's examination of Plaintiff that was performed on the same day Mr. Udy filled out the disability paperwork.  The ALJ indicated there were inconsistencies in the two reports. The ALJ further found "[t]he objective medical evidence does not demonstrate abnormalities that would interfere with the claimant's ability to perform the range of work identified above."[77]

The Court finds the ALJ's analysis of Mr. Udy's opinion to be supported by substantial evidence.  Upon review of Dr. Root's treatment notes from July 21, 2011 and Dr. Udy's opinion,

---

[72] Frantz, at 1301; see 20 C.F.R. §§ 414.1513(a), 404.1527(a)(2), 404.1527(d).
[73] Id; see 20 C.F.R. § 404.1513(d).
[74] SSR 06-3p (Aug. 9, 2006, effective date).
[75] Sanchez, at *5 (internal quotations and citations omitted).
[76] Tr. at 31.
[77] Tr. at 31.

it is evident as the ALJ indicated and the Defendant points out that there are discrepancies in the two evaluations. For example, Mr. Udy opined Plaintiff could use her hands for manipulating objects only 30% of the workday and reach overhead only 10% of the workday.[78] However, Dr. Root's examination revealed that Plaintiff had a normal range of motion in her arms and neck and full strength in her arms.[79] Dr. Root also indicated that Plaintiff had good fine and gross motion coordination.[80]

Moreover, the Court finds Plaintiff's arguments that the ALJ's conclusion that Mr. Udy relied on Plaintiff's subjective complaints to be improper speculation unpersuasive. First, as explained above, Mr. Udy is a physician's assistant and as such his opinion cannot be given controlling weight and is weighted differently than Dr. Root's opinion. The ALJ need only provide specific, good reasons for rejecting an opinion that a subsequent review may follow. The ALJ did just that. Throughout the record and at the hearing, Plaintiff reports that she is unable to work because of her condition but the treatment records indicate Plaintiff is not as limited as she claims. There are many records that detail her abilities to be within "normal" ranges.[81] Therefore, it is not unreasonable for the ALJ to conclude that in finding Ms. Bowen to be disabled, Mr. Udy relied on Plaintiff's subjective complaints when she presented to Dr. Root's office for disability paperwork. This is further evidenced by the physical examination of Plaintiff appears to be in contrast Mr. Udy's opinion as to Plaintiff's limitations. The Court finds Plaintiff is requesting that the Court re-weigh the evidence in front of the ALJ, something

---

[78] Tr. at 506.
[79] Tr. at 508.
[80] Id.
[81] See e.g, Tr. 462 ("Grossly normal MRI of the thoracic spine without contrast."); Tr. 517 ("The patient sits in the exam chair comfortably and she appears relaxed. She transfers from sit to stand independently and freely and she also demonstrates a completely normal gait without pattern limitations."); Tr. at 526 (Gait, Normal); Tr. at 527 ("Strength testing did not show any significant abnormalities in the lower extremities"); Tr. at 532 ("Certainly I find no objective data to suggest nerve damage and no explanation that I could find that would explain the patient's problems noted today.")

the Court is not allowed to do so.[82] Because the Court is able to follow the ALJ's reasoning with regard to Mr. Udy, a non-acceptable medical source and finds the ALJ's analysis of his opinion to be supported by substantial evidence.

### B. ALJ's RFC Assessment

Plaintiff argues the ALJ erred by improperly evaluating her residual functional capacity. Plaintiff argues the ALJ erred by not providing a basis for the limitations included in his RFC assessment that Plaintiff can use her upper extremities frequently. Second, Plaintiff asserts the ALJ erred in his evaluation of Plaintiff's mental impairments by not including her treatment for depression, stress and anxiety.

#### 1. Upper Extremities

Plaintiff argues the ALJ should have included limitations as to the use of Plaintiff's arms and hands in his RFC determination. The RFC reflects an individual's ability to do physical, mental and other work activities on a sustained basis despite limitations from the claimant's impairments.[83] In determining the claimant's RFC, the ALJ must base RFC assessments on all relevant evidence in the record, not just the medical evidence.[84] Further, the decision maker considers all of the claimant's *medically determinable impairments*, including those considered not "severe."[85] "A 'symptom' is not a 'medically determinable physical or mental impairment' and no symptoms by itself can establish the existence of such an impairment." Social Security Rule 96-4p further provides

> An 'impairment' must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Although the regulations provide that the existence of a

---

[82] See Qualls v. Astrue, 206 F.3d 1368, 1371 (10th Cir. 2000).
[83] See 20 C.F.R. §§ 404.1545, 416.945.
[84] 20 C.F.R. § 404.1545(a)(3); 416.945(a)(3); SSR 96-8p.
[85] See 20 C.F.R. § 416.945(a)(2); SSR 96-8p. (emphasis added)("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairments...")

medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities, i.e. medical signs and laboratory findings.[86]

In the instant case, the Court finds the ALJ did not err by not including Plaintiff's alleged limitations in her upper extremities in the RFC. First, although Mr. Udy's opinion does set forth limitations in Plaintiff's upper extremities but as noted above, the ALJ did not err in not giving Mr. Udy's opinion significant weight. In addition, Plaintiff's argument improperly rests upon the assumption that Plaintiff's complaints with regard to her arms make them medically determinable rather than just a symptom of her back condition. The record contains no objective medical findings of abnormalities with regard to Plaintiff's upper extremities. Rather, the record, including on the examination date that coincided with Mr. Udy's opinion indicates that Dr. Root did not find anything objectively wrong with Plaintiff's arms. Dr. Root's notes for July 21, 2011 states in relevant part:

> manual muscle testing shows 5/5 strength and equal bilateral of upper and lower extremities. Upper extremity and cervical range of motion are within functional limits. To a lesser extent the patient demonstrated tenderness throughout the mid back neck…both upper and lower extremities. Neurologically she is completely intact, although she does experience some generalized global decreased strength, probably due to significant deconditioning and decreased physical activity in general.[87]

Moreover, Dr. Root's treatment note preceding the July 2011 exam notes "her upper extremity symptoms sounds like she is experiencing carpal tunnel syndrome."[88] However, no mention is ever made of follow up treatment for carpal tunnel. Importantly

---

[86] SSR 96-4p.
[87] Tr. at 508.
[88] Tr. at 510.

too, although Plaintiff had undergone radiological testing and treatment on her back, no radiological or tests, other than strength tests (that were normal) were performed on Plaintiff's upper extremities by Dr. Root or Mr. Udy.

Therefore, the Court finds Plaintiff's arguments with regard to the ALJ's failure to include any limitations in Plaintiff's upper extremities to be without merit because issues with Plaintiff's upper extremities were symptoms and not medically determinable. Therefore, the ALJ's decision not to include these limitations in the RFC is supported by substantial evidence.

**2. Plaintiff's Anxiety and Depression Diagnoses**

The only evidence before the ALJ regarding any functional limitations that may have been a result of Plaintiff's depression, anxiety and stress diagnoses was the opinion of Mr. Udy. Mr. Udy opined Ms. Bowen's stress was severe enough to interfere with her attention and concentration frequently throughout the day. There are also some treatment records contained in the record from Dr. Root and Mr. Udy's care of Plaintiff that detail these conditions. The records demonstrate Plaintiff was given prescription medication including Xanax to manage her anxiety. However, besides treatment from Dr. Root and Mr. Udy, Plaintiff never received any specialized mental health treatment or was seen by psychologist or psychiatrist.

As discussed above, the Court finds no legal error in the ALJ's evaluation of the opinions of Dr. Root and Mr. Udy. Therefore, the ALJ not taking into account Mr. Udy's findings with regard to Plaintiffs mental limitations in crafting the RFC was reasonable. Moreover, the Court is persuaded by Defendant's arguments that Plaintiff never sought specialized treatment for these disorders and at the administrative hearing, Plaintiff's counsel testified Plaintiff had "no mental limitations." Therefore, these impairments were not medically determinable and the ALJ did not

err in not including them in the RFC. Thus, substantial evidence supports the ALJ's determination not to include Plaintiff's mental impairments in the RFC.[89]

## **CONCLUSION & ORDER**

For the foregoing reasons, the Court finds the Plaintiff's arguments regarding the ALJ"s rejection of her treating and examining physicians the ALJ's RFC determination do not have merit and do not warrant remand for further proceedings. Therefore, IT IS HEREBY ORDERED that the Commissioner's decision is AFFIRMED.

DATED this 27 March 2014.

_____
Brooke C. Wells
United States Magistrate Judge

---

[89] See SSR 96-8p, 1996 WL 374184 at *1 (1996)("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment…including the impact of any related symptoms.")